**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>*Movants/Defendants*,<br><br>.<br><br>AMERICAN BAR ASSOCIATION,<br><br>*Respondent/Plaintiff*<br><br>IN RE THIRD PARTY SUBPOENAS | Case No. 1:26-MC-114<br><br>Underlying Litigation:<br><br>*American Bar Association v. Executive Office of the President*, *et al.*, No. 1:25-CV-1888 (AHA) (D.D.C.) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER**

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

ARGUMENT ..... 3

I. THE ABA MUST PROCEED FIRST AGAINST THE LAW FIRMS BEFORE ATTEMPTING TO ENFORCE THE SUBPOENAS. ..... 3

II. THE ABA IMPROPERLY SEEKS COMMUNICATIONS THAT ARE COVERED BY THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE. ..... 6

A. The Government's Invocation of Presidential Communications Privilege is Not a Blanket Assertion of Absolute Privilege. ..... 6

B. The Government Need Not Confirm Nor Deny The Claims Regarding the President's Advisor and Counsel. ..... 8

C. Both Privilege and the Exhaustion Bar All Five Requests For Production, Not Only RFPs 2 Through 4. ..... 9

D. A Privilege Log is Premature Because this Motion Presents a Threshold Sequencing Question, Not a Document-by-Document Withholding Dispute. ..... 10

E. The Government Has Standing to Assert the Presidential Communications Privilege, Which Is the Core of the Motion. ..... 11

F. Rule 408 and Ordinary Proportionality Principles Reinforce the Exhaustion Requirement. ..... 13

III. The Subpoena Ad Testificandum Should Be Quashed Because the ABA Has Not Shown, and Cannot Show, Extraordinary Circumstances. ..... 13

CONCLUSION ..... 15

CERTIFICATE OF SERVICE ..... 17

## INTRODUCTION

The ABA's opposition concedes two facts that resolve this dispute in favor of granting the Government's Motion to Quash. First, the ABA has not exhausted the most direct and least sensitive source of the information it seeks by asking the fourteen law firms that are parties to the Agreements and Orders at the heart of this case to turn over the same information it seeks from the third party (the "President's Advisor and Counsel").[1] Second, the ABA's own opposition brief relies on public reporting to argue that the President's Advisor and Counsel was "closely involved" in advising the President on the precise subject of these subpoenas. Opp. at 18 & n.7. Those two concessions confirm that the presidential communications privilege applies, and that the ABA's subpoenas to the President's Advisor and Counsel must be quashed.

Moreover, contrary to its assertion, the ABA is not in a "catch-22." Exhaustion and privilege are complementary limits to protecting the same interest—the confidentiality of the President's decision-making process. Both point in the same direction here: to the law firms first, not to the President's Advisor and Counsel. The Government has never argued, and does not argue now, that the ABA can obtain this discovery from nowhere. Instead, the ABA must obtain it, if at all, from the parties who actually negotiated and signed the Agreements, including its own counsel, before it may attempt to improperly reach past them to the President's Advisor and Counsel and, through him, to the President.

[1] For the reasons movants previously explained in their motion to quash, "[t]he President cannot be compelled to divulge even the identity of any individual from whom he receives confidential advice" and so "for purposes of this motion," movants need not "confirm nor deny whether the President even received advice from any third party regarding the Executive Orders." Mot. at 1. To the extent that respondent chooses to frame its opposition based on a report characterizing the third party as the President's close advisor and personal counsel, Opp. at 18 n.7, movants adopt this nomenclature for convenience without confirming or denying this reported relationship.

The remainder of the ABA's opposition fares no better. Its standing argument mistakes the nature of the privilege at issue. The Government's Motion rests principally on the presidential communications privilege; this is an institutional privilege of the Executive, that the Government has both the authority and the obligation to assert on the President's behalf. Nor does the ABA's improper demand for a privilege log from the President's Advisor and Counsel make sense. An order requiring the President's Advisor and Counsel to respond to the subpoena in any meaningful way, including by providing a privilege log, would improperly breach the presidential communications privilege that protects against the disclosure of the identity of a presidential advisor. Moreover, it would bypass the threshold question of whether third-party discovery of a close, private adviser and counsel of the President may proceed at all before other sources of the information have been exhausted. Further, the ABA's insistence that RFPs 1 and 5 raise no privilege concerns once again ignores the presidential communications privilege over the identity of advisors, as well as the substantial overlap between those requests and the plainly privilege-implicated RFPs 2 through 4. The fourteen law firms named in RFP 1 are themselves an obvious, unexhausted, non-privileged source for that very material. They also include ABA's retained counsel, Susman Godfrey LLP.

Finally, this Court should reject the ABA's wrongful attempt to confine the heightened protection for depositions of close presidential advisers to individuals holding an official government title. This is at odds with Circuit precedent and the Office of Legal Counsel's recent opinion. *Applicability of Executive Privilege to Presidential Communications with Private Advisers*, 50 Op. O.L.C. __ (2026). The need to protect the confidentiality of advice given to the President and to prevent needless intrusion into the workings of a coordinate branch apply with full force to a close adviser and counsel, whose relevant knowledge derives, by the ABA's own

arguments, from his role advising the President in the Oval Office and beyond on the subject of the subpoenas. The Motion to Quash should be granted.

**ARGUMENT**

## I. THE ABA MUST PROCEED FIRST AGAINST THE LAW FIRMS BEFORE ATTEMPTING TO ENFORCE THE SUBPOENAS.

Opposing the motion to quash, the ABA wrongfully argues that the Government cannot simultaneously demand exhaustion of alternative sources when the ABA seeks discovery from the White House and assert privilege when the ABA seeks the same discovery from the President's Advisor and Counsel. Opp. at 1–2. Actually, this is precisely what caselaw requires when such sensitive discovery is sought.

Exhaustion and privilege address different—but related—risks to the same underlying interest: preserving the Executive's Article II prerogatives, which includes the confidentiality that the President requires to obtain candid advice. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) ("As we have already noted, special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated."). Exhaustion requires a party to pursue less intrusive means before proceeding directly against the President or his immediate office, precisely because "the high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery[.]" *Id.*; *see Karnoski v. Trump*, 926 F.3d 1180, 1205 (9th Cir. 2019) (holding that under *Cheney*, for the plaintiffs to seek White House discovery, they "must make a preliminary showing of need" and further demonstrate that the evidence "is not available with due diligence elsewhere."). The presidential communications privilege, on the other hand, protects the substance of the President's confidential communications and the identity of those who provide him advice. *See In re Sealed Case*, 121

F.3d 729, 750–52 (D.C. Cir. 1997). These doctrines safeguard the same interest. The Government's position—that the ABA must go to the law firms first, and that if the ABA ultimately reaches the President's Advisor and Counsel, it will still confront privilege over his communications with the President—is not a contradiction, but the appropriate sequence.

Nor did the Government concede otherwise at the July 31 discovery conference. The Government's statement that the Third-Party subpoena "bypass[es] the *Cheney* problem," Hr'g Tr. at 38:7–15, ECF No. 75, addressed only the expedited *Cheney* procedure set out in this Court's Scheduling Order, ECF No. 57 at 2–3.[2] The Government argued that the "proper vehicle" for addressing RFPs 3 and 4 *directed at the Executive Office of the President* is the instant Motion, where the privilege issue has already been teed up for consideration, not the ABA's motion to compel. *See* Hr'g Tr. at 55:7–12. There was no concession that a third-party subpoena can never present separation of powers concerns. Indeed, as the Government stated earlier at the hearing, "we certainly think that seeking a Rule 45 subpoena is one way to exhaust. But . . . exhausting by subpoenaing the President's personal attorney . . . basically just trades one separation of powers issue for another, which is why the government has moved to quash." *Id*. at 37:9–15. As the Supreme Court has squarely observed, "these separation-of-powers concerns are no less palpable here simply because the subpoenas were issued to third parties." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020); *see* ECF No. 67 at 10–11 (discussing *Mazars*). Since "there is not always a clear line between his personal and official affairs," separation of powers "does not vanish simply because the subpoenas seek" communications from the President's personal attorney. *Mazars*, 591 U.S. at 868. Otherwise, a party could seek from a third-party subpoena exactly what it could not

---

[2] Unless otherwise indicated, "ECF" citations refer to entries in the underlying litigation, *ABA v. EOP*, No. 1:25-cv-01888-AHA.

obtain directly from the President, simply by choosing a different addressee for the same request. This is what the ABA urges, but this wrongful theory would create the perverse incentive *Mazars* warned against.

Nor is the Government's position "ever-shifting." Opp. at 2–3. The fourteen law firms that are actual parties to the Agreements and actual recipients of the Orders are the most direct, least sensitive, and readily available source of the documents and testimony the ABA seeks. (They also include ABA's own retained counsel.) The Government itself has already subpoenaed these firms, precisely so that this information can be obtained without resort to a third-party subpoena of the President's Advisor and Counsel. *See* ECF No. 67-1. And "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and *second, that this evidence is not available with due diligence elsewhere*." *In re Sealed Case*, 121 F.3d at 754 (emphasis added). Accordingly, even assuming the ABA can satisfy the first prong (which it cannot), it certainly cannot meet the second. The ABA, of course, complains that it "cannot obtain all of the information" the President's Advisor and Counsel "may possess by deposing . . . individuals at law firms who may have communicated with" him "because the testimony of those individuals would necessarily be limited to whatever [President's Advisor and Counsel] chose to share with them." Opp. at 18-19. But, speculation aside, the ABA must start with the law firms before seeking discovery from the President's Advisor and Counsel, much less the White House.

Finally, the ABA's sequencing is out of order. It served notice of intent to subpoena the third party before this Court had even entered a scheduling order, ECF No. 57, and before propounding a single request on any of the law firms themselves, including its own counsel, which it still refuses to do.

## II. THE ABA IMPROPERLY SEEKS COMMUNICATIONS THAT ARE COVERED BY THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE.

As the Government explained in its Motion, any communications the third party had with the President or his senior advisers are protected by the presidential communications privilege, regardless of the third party's non-government status. Mot. at 5–9. The ABA arguments in opposition are meritless.

### A. The Government's Invocation of Presidential Communications Privilege is Not a Blanket Assertion of Absolute Privilege.

Most conspicuously, the ABA fails to meaningfully address the memorandum recently issued by the Office of Legal Counsel ("OLC"). *Applicability of Executive Privilege to Presidential Communications with Private Advisers*, 50 Op. O.L.C. at 1 (explaining executive privilege applies "to presidential communications with private advisers so long as the communications (1) relate to official presidential decisionmaking, (2) involve or reflect communications with the President or his direct advisers, and (3) are confidential"). The ABA relegates OLC's opinion to a single footnote with the following conclusory observation: that OLC's work is "not the law and is entitled to no deference by this Court in view of the preposterous timing and circumstances of the OLC opinion's issuance." Opp. at 9 n.4. That is emotion, not reasoned argument. In contrast, the opinion itself is a full 21-pages of legal analysis tracing the history, tradition, and case law on this precise question. The OLC opinion is consistent with caselaw recognizing that the presidential communications privilege extends to the identities of those "[o]utside advisers," who "may be reluctant to provide advice on controversial or unpopular policies based on a fear of public disclosure or potential ramifications for their personal endeavors." 50 Op. O.L.C. at 14.

It is also critical that the presidential communications privilege covers the identity of the President's advisers, as the Government has previously explained. ECF No. 79. *Nixon* was explicit about this: "Human experience teaches," the Supreme Court instructed, "that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974). The presidential communications privilege in particular "reflects the idea that the 'President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.'" *Am. First Legal Found. v. U.S. Dep't of Agric.*, 126 F.4th 691, 695 (D.C. Cir. 2025) (quoting *Nixon*, 418 U.S. at 708). Indeed, in *Judicial Watch, Inc. v. U.S. Secret Service*, the D.C. Circuit exempted White House visitor logs entirely from FOIA, notwithstanding the fact that those records were in the custody of an agency regulated under Title 5 by FOIA. 726 F.3d 208, 217 (D.C. Cir. 2013). In reaching this conclusion, the court noted that "whether the presidential communications privilege . . . extends to the *names* of visitors to the President and his staff. . . . would be at least as difficult—and present separation-of-powers questions at least as serious—as deciding the question now before us." *Id.* at 230 (emphasis added).

Instead, the ABA repeats the same false refrain: that the Government is making a "blanket assertion of absolute presidential privilege." Opp. at 1. Not so. While the presidential communications privilege is "qualified," *In re Sealed Case*, 121 F.3d at 745, it is also "presumptive" and "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708. That privilege is difficult to overcome. *See In re Sealed Case*, 121 F.3d at 746 ("Finally, while both the deliberative process privilege and the presidential privilege are qualified privileges, the *Nixon* cases suggest that the

presidential communications privilege is more difficult to surmount.”). “As *Nixon* recognized, the right to production of relevant evidence in civil proceedings does not have the same ‘constitutional dimensions.’” *Cheney*, 542 U.S. at 384 (citing *Nixon*, 418 U.S. at 711).

### B. The Government Need Not Confirm Nor Deny The Claims Regarding the President’s Advisor and Counsel.

The ABA wrongly faults the Government for declining to “confirm or deny” whether the President’s Advisor and Counsel in fact advised the President with respect to matters relevant to the ABA’s Complaint. Opp. at 1, 9–10. The ABA’s own opposition answers the very question it accuses the Government of dodging. In arguing that the President’s Advisor and Counsel should be deposed, the ABA cites a New York Times report for the proposition that he advised the President on the policies at issue in this case. *Id*. at 18 & n.7 (citing Michael S. Schmidt & Jessica Silver-Greenberg, *How a Top Law Firm Went From Standing Up to Trump to Bending the Knee*, N.Y. Times (Aug. 2, 2026)). The ABA’s decision to cite this article and focus their subpoena on information related to “Executive Orders” cannot be squared with the ABA’s simultaneous insistence that the President’s Advisor and Counsel’s role has nothing to do with advising the President for purposes of presidential communications privilege.

This “operational proximity to the President himself” is why the presidential communications privilege and broader separation-of-powers considerations exist. *See Ass’n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993); *see also id.* at 908–09 (recognizing the long tradition of presidents consulting private “kitchen cabinet[]” advisers outside of any formal government role); *In re Sealed Case*, 121 F.3d at 750-52 (privilege extends to communications advisers “solicited and received from others,” including non-employees, to facilitate “candid and informed advice” to the President). Further, the very knowledge the ABA seeks to elicit is knowledge the ABA itself attributes to his reported relationship with the President,

which requires privilege. *Cf. Am. First Legal Found.*, 126 F.4th at 698 (applying presidential communications privilege to communications that were "solicited by President" and "served to inform presidential decisionmaking and deliberations"); *United States v. Newman*, 531 F. Supp. 3d 181, 190 (D.D.C. 2021) (granting protective order to prevent deposition of Deputy White House Counsel and Deputy Assistant to the President); *Alexander v. FBI*, 186 F.R.D. 1, 4 & n.1 (D.D.C. 1998) (explaining that rationale applicable to the protection of high-ranking government officials "is equally applicable" to "positions at the White House" including those employed as "Senior Advisors").

### C. Both Privilege and the Exhaustion Bar All Five Requests For Production, Not Only RFPs 2 Through 4.

The ABA attempts to fault the Government for failing to specifically address the harms posed by RFP 1 (communications with the fourteen law firms) and RFP 5 (social media posts and messages). Opp. at 8–9. But those cannot supply a basis to evade privilege and exhaustion requirements.

To start, RFP 1 is duplicative with the other RFPs. RFP 1 seeks "all communications on or after January 20, 2025" that the third party exchanged with the same fourteen law firms that are the subject of the Law Firm Orders and Agreements. ECF No. 2-1 at 12, No. 1:26-MC-0114. RFP 1 thus substantially subsumes RFPs 2-4 for "all communications on or after January 20, 2025 relating to any possible issuance of any Executive Order" or "any Agreement(s)" or "any Law Firm Order." *See id*. The ABA does not allege and does not identify any communications that would be captured by RFP 1 but not otherwise contained in RFPs 2, 3, or 4. Even if they were, they would be irrelevant to the litigation if they did not bear on any Executive Order or Agreement. To the extent any such communications reflect instructions from, or were undertaken at the direction of, the President, they could implicate the presidential communications privilege

regardless of which numbered request captures them. *See In re Sealed Case*, 121 F.3d at 752 (privilege covers communications an adviser "solicited and received from others" in service of advising the President, not only those he authored himself).

More fundamentally, the fourteen law firms on the other end of these communications are themselves the direct, unexhausted, non-privileged source that the ABA must pursue first. RFP 1 is, if anything, the clearest example of a request the ABA could and should have directed to the law firms, before directing it to a presidential adviser.

RFP 5's request for social media posts and direct messages "discussing or relating to any Law Firm Order or Agreement" is, if anything, broader and less justified. The ABA has made no showing that responsive, non-public material exists, nor any showing that it could not be obtained through public archives or through the fourteen firms' own records of any communications directed at them.

### D. A Privilege Log is Premature Because this Motion Presents a Threshold Sequencing Question, Not a Document-by-Document Withholding Dispute.

The ABA argues that the proper course was for the Government to produce a privilege log under Rule 45(e)(2) and Rule 26(b)(5)(A), and that the "blanket" nature of the Government's privilege assertion, without such a log, cannot support quashing the Subpoenas. Opp. at 9–13 (citing *Dellums v. Powell*, 642 F.2d 1351 (D.C. Cir. 1980); *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998)). That argument conflates two different procedural postures.

*Dellums* and *Lindsey* address what a privilege holder must show to withhold specific, already-identified documents after discovery has been found appropriate—a document-by-document dispute that necessarily follows a threshold determination that discovery is appropriate in the first place. *See Dellums*, 642 F.2d at 1363 (requiring particularity as to each "particular transcript" of taped conversations sought to be withheld); *Lindsey*, 158 F.3d at 1270–71 (similar,

for testimony regarding specific conversations). *In re Sealed Case* followed the same sequence: the government's log identified and justified withholding as to each of eighty-four specific documents only after the grand jury's need for the underlying discovery had already been established. 121 F.3d at 735, 757–58.

This Motion presents the antecedent question that those cases did not reach: whether the ABA may compel the disclosure of the identity of a close presidential adviser, in the first instance, and then require him to search for, collect, and produce documents—and sit for a deposition—before it has exhausted the more direct, non-privileged sources squarely available to it (including its own retained counsel). The answer is no. Further, courts evaluating that threshold question do not require the deponent party to first catalog every document or answer that might eventually be withheld; they ask instead whether the requesting party has shown that the information cannot be obtained elsewhere. *Cf. Kelley v. FBI*, No. 13-0825, 2015 WL 13648073, at *2 (D.D.C. July 16, 2015) (quashing deposition subpoena where movant had not shown the information "cannot be obtained elsewhere."). Until the ABA has exhausted other alternatives, a privilege log is premature, and, if such alternatives were exhausted, would violate the presidential communications privilege asserted.

### E. The Government Has Standing to Assert the Presidential Communications Privilege, Which Is the Core of the Motion.

The ABA devotes a few pages of its opposition to arguing that the Government lacks standing to assert personal attorney-client privilege on the President's behalf, and that the Government has not claimed any cognizable "burden." Opp. at 6–8. But the Government's Motion is not a burden-based motion, and its core argument does not rest solely on personal attorney-client privilege. The Motion focuses on the presidential communications privilege, an institutional privilege belonging to the Office of the President that the Executive Branch unquestionably has

standing and authority to assert. *See In re Sealed Case*, 121 F.3d at 745–46, 752 (distinguishing the institutional presidential communications privilege, which may be asserted by the Executive Branch generally, from privileges personal to the President). The alternative and additional basis, that any attorney-client relationship between the President's Advisor and Counsel and the President would independently protect certain communications, Mot. at 1–2, 9, does not convert the Motion into one asserting a personal privilege. Nor does it require the Government to disclaim the institutional privilege that is its principal ground for relief. None of the privileges are waived by the Government or President Trump.

Furthermore, executive privilege has several components, including not just the presidential communications privilege but also the attorney-client privilege, state secrets privilege, and deliberative process privilege. *See, e.g.*, *Lindsey*, 158 F.3d at 1269; *Congressional Oversight of the White House*, 45 Op. O.L.C. __, 30 (2021) ("There are at least five well-recognized, and sometimes overlapping, components of executive privilege: national security and foreign affairs, law enforcement, deliberative process, attorney-client communications and attorney work product, and presidential communications."). To the extent that the President's Advisor and Counsel provided legal advice to the President, those communications would be independently subject to attorney client privilege, and the Government has standing to assert that aspect of executive privilege—as it does all aspects of executive privilege. Nothing in attorney-client privilege turns on the employment status of the third party. Rather, the question is whether the advice was legal in nature and whether it informed official action. *See Congressional Oversight*, 45 Op. O.L.C. at 32-34; *Applicability of Executive Privilege*, 50 Op. O.L.C. at 21. The ABA's claims to the contrary are without merit.

### F. Rule 408 and Ordinary Proportionality Principles Reinforce the Exhaustion Requirement.

The ABA is correct that Rule 408 is a rule of trial admissibility and not, standing alone, an independent discovery privilege. Opp. at 13–14 (citing *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 234 F. Supp. 3d 209, 211 n.1 (D.D.C. 2017)). The Motion did not contend otherwise; it invoked Rule 408 as one input into the ordinary Rule 26(b)(1) relevance-and-proportionality analysis, given that requiring an alleged confidential presidential adviser to reconstruct settlement communications is a more burdensome and more privilege-impacting way of obtaining that information than simply asking the settling law firms. Mot. at 8–9. That proportionality issue stands independent of whether Rule 408 itself bars discovery, and it reinforces the Government's exhaustion argument.

## III. The Subpoena Ad Testificandum Should Be Quashed Because the ABA Has Not Shown, and Cannot Show, Extraordinary Circumstances.

The ABA's principal response to the Motion's deposition arguments is that the heightened "exceptional circumstances" standard applies only to depositions of "high-ranking government officials," and that the third party, holding no formal government title, falls outside it entirely. Opp. at 14–18 (citing, e.g., *Alexander*, 186 F.R.D. at 3–4; *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013)). That argument fails and is form over substance.

The rule exists to protect two related interests: preventing unnecessary interference with a coordinate branch's ability to function and preserving the confidentiality that enables candid advice to flow to the official ultimately responsible for the decision. *See Zimmerman v. Al Jazeera Am., LLC*, 329 F.R.D. 1, 6 (D.D.C. 2018) ("The apex doctrine … derives from the premise that government officials should be allowed to perform their duties without undue disruption and reflects a desire to protect the integrity of the administrative process."). Where, as here, the deponent is not a government employee at all, the confidentiality-of-advice rationale applies with

undiminished, if not greater, force, because what is at stake is the President's need for candid advice. *Cheney* itself confirms that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated," 542 U.S. at 385, in a case that itself involved discovery aimed at private, non-governmental participants in confidential advice to the President's office. *Id.* at 374. *Cheney* does not condition that protection on the deponent's formal job title, and the ABA has cited no case holding that a close, personal presidential adviser may be deposed about his advice to the President on a lesser showing than a formally titled one, merely because he lacks a government paycheck.

Indeed, as noted above, the ABA's own opposition supplies the very showing that would trigger heightened protection even under the ABA's own formulation of the doctrine: its reliance on public reporting that the President's Advisor and Counsel was "closely involved" in negotiating the Agreements in the Oval Office with the President—that is itself an allegation that he functioned as a close adviser to the President on this exact subject matter. The ABA cannot invoke that role to justify the deposition's relevance while denying that the same role triggers any heightened protection, which it does.

Even if the ABA were correct (it is not) that some lesser showing suffices when there is a non-government actor involved, it still falls short. The ABA has not shown, because it has not tried, that the information it seeks from the President's Advisor and Counsel cannot be obtained from the fourteen law firms that negotiated and signed the Agreements at issue, including its own counsel in this case. Until the ABA has exhausted that plainly available, non-privileged, first-hand source, it cannot show the "exceptional circumstances" necessary to justify going instead, or simultaneously, to a person publicly reported to have advised the President directly on the same

subject. *See Alexander*, 186 F.R.D. at 4; *Kelley*, 2015 WL 13648073, at *2; *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (declining to permit deposition of a high-level adviser where a lower-level, less-sensitive source "would seem more logically suited" to the same information).

**CONCLUSION**

The Court should grant the Motion to Quash the Subpoenas and for a Protective Order in its entirety. At a minimum, the Court should hold the Subpoenas in abeyance pending the ABA's exhaustion of discovery from the fourteen law firms already subject to subpoena, consistent with *Cheney* and the sequencing the Government has consistently urged throughout this litigation. Nothing in the Government's brief should be read to prejudice or waive any privileges or rights of President Trump, or any arguments that the President's Counsel and Advisor may choose to raise in response to the subpoenas.

Dated: August 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
DIANE KELLEHER
Directors, Federal Programs Branch

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

CHRISTOPHER M. LYNCH
JAMES R. POWERS
Chief Litigation Counsel, Federal Programs Branch

*/s/ James J. Wen*__
MICHAEL VELCHIK (D.C. Bar. 187249)
Senior Counsel
JAMES J. WEN
M. JARED LITTMAN
ADAM S. FOX

Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 616-8185
Email: James.J.Wen@usdoj.gov
*Attorneys for Defendants*

**CERTIFICATION OF SERVICE**

I hereby certify that, on August 25, 2026, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *James J. Wen*__
JAMES J. WEN